UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

GREAT WHITE NORTH FRANCHISEE          )
ASSOCIATION-USA, INC.,                )
                                      )
     Plaintiff,                       )
                                      )
vs.                                   )          Case No.:
                                      )
TIM HORTONS USA, INC.,                )
RESTAURANT BRANDS INTERNATIONAL,      )
LIMITED PARTNERSHIP, THE TDL GROUP    )
CORP. , THD COFFEE CO., ELIAS DIAZ    )
SESE, and JOHN DOES 1-20,             )
                                      )
     Defendants.                      )
_____/  )

## COMPLAINT FOR DECLARATORY RELIEF

     Plaintiff, Great White North Franchisee Association-USA, Inc., on behalf of its United States franchisee members (hereinafter the "Association"), and by and through the Association's attorneys, sues Defendants, Tim Hortons USA, Inc. ("Tim Hortons"), Restaurant Brands International Limited Partnership ("RBI"), The TDL Group Corp. ("TDL"), THD Coffee Co. ("THD"), Elias Diaz Sese, and John Does 1-20 seeking declaratory relief, and alleges:

## INTRODUCTION

     1.    This is a declaratory action brought by the Association, a group of the majority of the franchisees in the Tim Hortons restaurant chain in the United States, arising from the illegal and fraudulent business scheme implemented by private equity group, RBI, upon its takeover of the iconic Canada-based Tim Hortons franchise system.

     2.    RBI was formed by global investment firm 3G Capital Restaurant Brands Holdings LP ("3G RBH"), an affiliate of 3G Capital Partners, Ltd. ("3G Capital"), upon purchasing the Tim

Hortons franchise system on or about August 25, 2014. Even though the vast majority of Tim Hortons restaurants are in Canada, Tim Hortons was growing in the U.S. prior to the brand's takeover by RBI. The brand added 259 stores from 2011 to 2013. In 2015, the first full year under RBI's management, Tim Hortons closed 127 U.S. outlets. From 2016 to 2018, Tim Hortons lost another 31 outlets. In 2019, dozens of Tim Hortons locations closed in Ohio, Minnesota, and Michigan. "Same store sales" in the open restaurants have reportedly fallen quarter after quarter in recent years. RBI admitted failures of the Tim Hortons brand to catch on in the U.S. and it fell from 4th to 50th in the annual ranking of brand reputation in Canada in the first quarter of 2019.

3.      In an apparent attempt to off-set the brand growth in the U.S. and stagnant sales in both the U.S. and Canada, RBI fraudulently commenced its fraudulent strategy to convert the Tim Hortons franchise system into a supply chain business disguised as a franchise system by, among other things, limiting the source of goods to "sole suppliers" either affiliated with RBI or unaffiliated but paying rebates to RBI and reaping outrageous profits by price gouging U.S. franchisees on all goods necessary to operate Tim Hortons restaurants.

4.      RBI's illegal and fraudulent scheme exploits the overwhelming economic power it holds over the Association's franchisee members by creating a captive artificial consumer market, comprised of all of the U.S. Tim Hortons franchisees, for products and services needed to begin and continue to operate a Tim Hortons franchised restaurant. While concealing the true nature of its own fiscal relationships with suppliers from franchisees, RBI, through Tim Hortons and its web of affiliates, uses its exclusive control over the franchise system to, among other things, force franchisees to purchase needed goods at a cost far greater than market value and to work with Tim Hortons-mandated suppliers which have rebate relationships with RBI and its affiliates and pay those suppliers excessive prices for goods and services that bear no relation to those that could be

2

achieved in arm's length transactions. Additionally, as alleged herein, the Association's franchisee members pay marketing fees which have been misappropriated, and the franchisees' equity in their businesses are being stripped completely through unconscionable contractual language in new and renewal franchise agreements.

5.     The Association brings this claim for declaratory and injunctive relief alleging violations of: (a) the Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. §§1962(c) and 1962(d); (b) Section 16 of the Clayton Act by reason of Tim Hortons and RBI's violations of the Sherman Act, 15 U.S.C. §1 *et. seq.*; (c) the Florida Antitrust Law, Fla. Stat. §542.15; (d) the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201 *et seq.*; and (e) breach of contract, and breach of the implied covenant of good faith and fair dealing. Through this lawsuit, the Association seeks relief from this Court to remedy Defendants' unconscionable, fraudulent, unlawful, deceptive, and anticompetitive practices in connection with the operation of its franchising scheme.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over the Association's claim brought under RICO and the federal antitrust laws pursuant to 28 U.S.C. §1331 and, in the alternative, pursuant to 28 U.S.C. §1332. The amount in controversy exceeds $75,000 as measured in this declaratory action by the value of the object of the litigation and the right for the Association's franchisee members to be protected. This Court has supplemental jurisdiction of the counts based on Florida law pursuant to 28 U.S.C. §1367(a).

7.     Venue is proper within this judicial district under 28 U.S.C. §§1391(b) and/or (c) in that, *inter alia*, Defendants are citizens of, do business and are subject to personal jurisdiction in this District. Moreover, a substantial part of the events on which Plaintiff's claims are based

occurred in this District. The franchise agreements signed by the Association's franchisee members also requires venue to be commenced where Tim Hortons has its principal office which is in Miami-Dade County.

## PARTIES

8.      Plaintiff, the Great White North Franchisee Association-USA, Inc., is a not for profit franchisee association with a principal place of business in Bowmansville, New York.

9.      The Association was formed as the direct result of its members' commonly themed grievances pertaining to certain practices and operations of Defendants as alleged herein. The majority of the Association's franchisee members are based in New York, Ohio and Michigan. There are no Tim Hortons franchise locations in Florida.

10.     The Association was organized and exists for the purpose of protecting and preserving the rights of Tim Hortons' U.S. franchisees and was created to serve as an official voice of the Tim Hortons' U.S. franchisee community.

11.     Defendant, Tim Hortons, is a Delaware incorporated entity with a principal place of business located at 5505 Blue Lagoon Drive, Miami, Florida 33126. Tim Hortons is the franchisor of the Tim Hortons quick-service franchise restaurant system.

12.     Tim Hortons restaurants are quick service restaurants with a convenience store element and a food menu that includes coffee, tea, espresso-based hot and cold drinks, baked goods, including donuts, muffins, cookies and pastries, paninis, sandwiches, wraps, soups and items typically found at a convenience store. Tim Hortons restaurants also use other supplies, including paper goods, dry goods, dairy, cleaners, and frozen goods.

13.     Defendant, RBI, is a Canadian limited partnership with corporate offices and U.S. headquarters located in Miami, Florida, located at 5505 Blue Lagoon Drive, Miami, Florida 33126.

14.     RBI is a subsidiary of Restaurant Brands International, Inc., and serves as the parent company of The TDL Group Corp., Burger King Worldwide, Inc., and Popeye's Louisiana Kitchen, Inc.

15.     Defendant, TDL, is a Canadian corporation which sells products to Tim Hortons' franchisees in the United States.  TDL has sold franchises in Canada since January 1965, which are similar to the franchises offered in the U.S.

16.     Defendant, Elias Diaz Sese, is, on information and belief, a citizen of the State of Florida and is otherwise *sui juris*.

17.     Mr. Sese was appointed by RBI to be the CEO of Tim Hortons in December 2014. Mr. Sese stepped down from that role shortly after Canadian Tim Hortons franchisees accused the brand of misappropriating funds from their national advertising fund.

18.     Defendants, John Does 1-20, are additional but unknown "persons" as defined by the civil RICO statutes, namely RBI and Tim Hortons officers, directors, and executives.

## RBI'S ROLE IN THE TIM HORTONS' SYSTEM

19.     Tim Hortons is an indirect subsidiary of RBI. 3G RBH owns the largest percentage of the combined voting power of RBI (approximately 32% as of December 2019).

20.     RBI also indirectly owns Burger King Corporation and Popeyes Louisiana Kitchen, Inc.

21.     RBI is a publicly traded company which is required to submit a Form 10-K to the Securities and Exchange Commission ("SEC").

22.     With regard to manufacturing, supply and distribution, RBI stated in its SEC Form 10-K as follows:

(a) Tim Hortons' franchisees are required to purchase substantially all food and other products from approved suppliers and distributors;

(b) As of December 31, 2018, Tim Hortons has only one or a few suppliers to service each category of products sold at our system restaurants;

(c) RBI sells most raw materials and supplies, including coffee, sugar, paper goods and other restaurant supplies to Tim Hortons' restaurants in Canada and the U.S.;

(d) RBI purchases raw materials from multiple suppliers and generally have alternative sources of supply for each;

(e) RBI monitors world market conditions for green (unroasted) coffee and contracts for future supply volumes to obtain expected requirements of high-quality coffee beans at acceptable prices;

(f) In Canada, RBI supplies paper and dry goods, as well as frozen baked goods and some refrigerated products as the distributor through five distribution centers located in Canada but, in the U.S., RBI supplies these similar products through third-party distributors;

(g) RBI has entered into long-term supply arrangements with certain major beverage vendors for the Tim Hortons' brand;

(h) RBI's profitability and the profitability of RBI's franchisees depends on RBI's ability to anticipate and react to changes in food, commodity and supply costs; and

(i)   With respect to RBI's Tim Hortons business, volatility in connection with certain key commodities that RBI purchases in the ordinary course of business can impact revenues, costs and margins.

23.     With regard to marketing and advertising programs, RBI admits in its SEC Form 10-K as follows:

(a)   RBI manages the advertising funds for each of its brands in the U.S. and Canada;

(b)   In general, franchisees fund substantially all of the marketing programs for each of RBI's brands by making contributions ranging from 2.0% to 5.0% of sales to advertising funds;

(c)   RBI's revenues are heavily influenced by brand marketing and advertising and by RBI's ability to develop and launch new and innovative products;

(d)   RBI's marketing and advertising programs may not be successful, or RBI may fail to develop commercially successful new products, which may lead RBI to fail to attract new guests and retain existing guests, which, in turn, could materially and adversely affect its results of operations;

(e)   To the extent RBI uses value offerings in our marketing and advertising programs to drive traffic, the low-price offerings may condition our guests to resist higher prices in a more favorable economic environment;

(f)   RBI is seeking to improve its service model and strengthen relationships with customers, digital channels, loyalty initiatives, mobile ordering and payment systems and delivery initiatives which may not have the anticipated impact on

our franchise sales and, therefore, RBI may not fully realize the intended benefits of these significant investments;

(g) Under RBI's franchise agreements, advertising contributions paid by franchisees must be spent on advertising, product development, marketing and related activities; and

(h) RBI, as part of its global marketing strategy, takes responsibility of providing Tim Hortons' franchisees with advertising support and guidance to deliver a consistent global message.

24.    With regard to goodwill and fair value, RBI admits in its SEC Form 10-K for the fiscal year that ended in 2018 as follows:

(a) Goodwill represents the excess of the purchase price over the fair value of assets acquired and liabilities assumed in acquisitions;

(b) RBI uses an income approach to estimate a reporting unit's fair value;

(c) Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants in the principal market, or if none exists, the most advantageous market, for the specific asset or liability at the measurement date (the exit price);

(d) The fair value is based on assumptions that market participants would use when pricing the asset or liability;

(e) Our Tim Hortons franchise agreements grant us the right to reacquire a restaurant under certain circumstances; and

(f) RBI's balance sheet reflects $5,486,000 in Goodwill in 2018.

25.     RBI and Tim Hortons generate revenue from sales to Tim Hortons franchisees related to RBI's supply chain operations, including manufacturing, procurement, warehousing and distribution, as well as sales to retailers.

### RBI AND TIM HORTONS ARE IN THE SUPPLY CHAIN BUSINESS DISGUISED AS A FRANCHISE BUSINESS

26.     After 3G RBH's acquisition of the Tim Hortons brand, the *New York Times* reported that Tim Hortons fired most senior executives and reduced capital expenditures by 75%. 3G RBH's parent company, 3G Capital Inc. ("3G"), is known for its "relentless cost-cutting" upon taking over brands according to *Bloomberg*.

27.     Over the past three years, RBI has reported overall declining same-store sales figures for its Tim Hortons Restaurants each quarter including a 4.3% decline in same-store sales in the quarter ending December 31, 2019.

28.     The same-store sales figures reveal that franchisees are struggling to increase their top line.

29.     On February 10, 2020, RBI CEO, Jose Cil, acknowledged publicly that "in our review of our tactics going back several years, it's clear we strayed from [our] core values [of value, quality, simplicity, personal relationships and giving back to the community.]"

30.     However, despite utilizing a relatively skeleton staff with limited resources and store sales declining, Tim Hortons has year-after-year been able to turn a hefty profit at the expense of their franchisees.

31.     Shortly after takeover of the Tim Hortons brand, RBI set up a vertically integrated supply chain specifically for its Tim Hortons business in which it manufactures, warehouses and distributes most of the food and restaurant supplies to the Association's franchisee members.

32.     In 2017, for example, RBI's SEC Form 10-K revealed a $78.1 million sales increase in the Tim Hortons segment driven by a $135.3 million *increase* in supply chain sales of products mostly consisting of products sold to its franchisees. The increase, which benefits RBI and its shareholders, was "partially offset by a $57.2 *decrease* in Tim Hortons' restaurant revenues" which primarily hurts franchisees.

33.     In 2016, the Tim Hortons segment was driven primarily by a $194.8 million increase in its supply chain sales.

34.     From 2015 to 2017, Tim Hortons earned approximately two to three times the amount of revenue from supply chain sales to franchisees as compared to franchise and property revenues. Specifically, in 2017, Tim Hortons earned $2.228 billion dollars in revenue from its supply chain sales compared to $925.7 million in franchise and property revenues.

35.     In the last quarter of 2019, RBI reported that Tim Hortons' sales through its supply chain to franchisees was $586 million while its franchise and property revenue was $286 million.

36.     RBI, through its Tim Hortons brand and its affiliates, including TDL and THD, has effectively become more of a supply chain company that earns the majority of its top-line revenue from sales of marked up product to franchisees and much less of a franchisor that traditionally provides support and guides its franchisees to profitability following a "system".

### TDL'S ROLE IN THE TIM HORTONS' SYSTEM

37.     TDL and Tim Hortons have an arrangement with third-party distributors under which the distributors provide warehousing and a distribution system for all of Tim Hortons' restaurants in the U.S.

38.     TDL sells Tim Hortons certain essential items for everyday operation including, but not limited to, paper products, uniforms, coffee, food products (such as baked goods, chicken,

and beef), dairy products, beverages, cleaning supplies, packaging and equipment ("Selected Goods"). TDL often sources goods from overseas, including beef and chicken from China, to keep their costs down and margins high.

39.     On information and belief, TDL earns a profit off the sale of Selected Goods to Tim Hortons.

40.     After Tim Hortons buys the Selected Goods from TDL, Tim Hortons re-sells the Selected Goods to a "distributor" for a profit.

41.     The "distributor" then sells the Selected Goods to the Association's franchisee members for a profit.

42.     TDL also purchases other goods, such as smallwares ("Articles"), from non-affiliated suppliers and then re-sells these goods to a distributor for a profit.

43.     The distributors are the only parties authorized by Tim Hortons to distribute these Selected Goods and Articles to Tim Hortons' franchisees in the United States.

44.     RBI, Tim Hortons, TDL, and their affiliates derive revenue from sales of Selected Goods and Articles to "distributors" which are the "sole suppliers" to the Association's franchisee members.

45.     Ultimately, Tim Hortons franchisees are forced to purchase the Selected Goods and Articles at a substantial markup from market rate. For example, Tim Hortons, through TDL and its other suppliers, charges the Association's franchisee members in excess of $104.08 per case more for Applewood bacon than Wendy's franchisees will pay for the identical product. Tim Hortons' franchisees also pay $23.85 more for boxes of diet and regular Coke; $10.92 more for a case of medium, large, or extra-large vinyl gloves; $11.92 more for a case of 9-inch plastic straws; and $9.53 more for a 50 count of register thermo tape than Wendy's franchisees.

11

46.     In 2015, the first full year after RBI took over the Tim Hortons brand, its affiliate, TDL had revenues of $793,768 from franchisee and operator purchases.

47.     Within a single year, in 2016, TDL's revenues jumped 395% from the previous year to $3,138,179 from franchisee and operator purchases.

48.     In 2017, Tim Hortons reported TDL's revenues had increased over $1.3 million from the previous year to $4,496,772 from franchisee and operator purchases even though the Tim Hortons system lost 50 franchised outlets in that fiscal year

49.     From 2015 to 2017, TDL's revenues from mandated supply and food purchases from U.S. franchisees from Tim Horton's affiliate TDL increased over 566% from $793,768 to $4,496,772 despite the system closing 142 Tim Hortons restaurants net during that 3-year period.

50.     TDL reported revenues of $3,880,910, from franchisee and operator purchases in the United States in 2018 in the Tim Hortons Franchise Disclosure Document ("FDD"). On information and belief, the actual revenue earned by TDL for Items purchased by U.S. franchisees far exceeds that amount.

## THD'S ROLE IN THE TIM HORTONS' SYSTEM

51.     THD, like TDL, is the affiliate utilized by RBI to serve as the master supplier of coffee to Tim Hortons' franchisees.

52.     THD, through an agreement with Maidstone Coffee Company ("Maidstone") in Rochester, New York, serves as the sole approved supplier of coffee to Tim Hortons U.S. franchisees.

53.     RBI, through Tim Hortons and/or TDH, set the prices for coffee sold to Tim Hortons franchisees.

54.     The cost of 2.5 ounces of Tim's Original Blend 144 from Maidstone, for example, sold to Tim Hortons franchisees is $71.41 per case.

55.     Tim Hortons U.S. franchisees pay approximately 50% more for the same quality coffee than close competitors.

56.     THD reported revenues of $15,847,310 in 2018 and $15,740,550 in 2017 from product purchasers from Tim Hortons U.S. franchisees.

57.     THD is the only approved source of coffee for Tim Hortons U.S. franchisees.

### RBI EXTRACTS UNLAWFUL PROFITS FROM FRANCHISEES

58.     Once franchisees in RBI's franchise systems, including Tim Hortons, are locked into franchise agreements, RBI defrauds them through tying the franchisees' ability to operate and utilize the proprietary trademarks to sole supplier agreements through TDL and TDH.

59.     The franchise agreements require – and RBI has publicly stated – that franchisees must purchase or lease all products, fixtures, furnishings, building components, equipment, decor, signs, paper goods, containers, cartons, packaging, supplies, smallwares and other utensils, services, including project management services, product ingredients, insurance and other items installed in, used, or sold by Tim Hortons U.S. franchisees at their restaurants (herein collectively "Items") solely from suppliers who have been approved by RBI and all these Items must meet RBI's specifications.

60.     Tim Hortons reserves the right to designate and does so designate itself, and its affiliates (including TDL and TDH) as the sole supplier for Items used by U.S. franchisees in the Tim Hortons franchise system.

61.     Tim Hortons also utilizes an unaffiliated sole supplier for every-day use goods such as donuts, croissants, baked goods, dairy and soda products, cleaning supplies, and digital menu

boards among others. Tim Hortons and/or TDL receive rebates from U.S. franchisee purchases of these products through the sole suppliers.

62.     Tim Hortons franchisees enter into their franchise agreements with limited and deceptive information regarding the nature of RBI's tying policies. The franchise agreements provide for alternate suppliers but only for Items for which there is no sole supplier which is, by Tim Hortons' own estimate, zero to five percent of all goods used by franchisees during their operation of the franchise.

63.     After locking in the Tim Hortons franchisees in the U.S., RBI exploits its unilateral control over the purchases that franchisees must make in two principal ways. First, RBI forces its Tim Hortons franchisees in the U.S. to purchase only goods provided by Tim Hortons or its affiliates as the sole supplier of distributed goods in the U.S. which sells franchisees marked-up Items. Second, Tim Hortons utilizes unaffiliated suppliers on certain everyday goods sold to U.S. franchisees for which RBI, through its affiliates, receives rebates on marked up Items which by any reasonable measure is unreasonable.

64.     Through its rebate scheme, RBI, and its subsidiaries and affiliates, reap substantial revenues and profits that come at the direct expense of Tim Hortons U.S. franchisees. This deliberate coercion, carried out using threats and intimidation, creates an environment where franchisees who have invested time, capital and sweat equity into the Tim Hortons brand as their livelihood, are preyed upon as the most immediate and dependable source of revenue and cash flow for RBI and its affiliates.

65.     Once the franchisees realize they are pawns in this fraudulent scheme, the sunk costs, onerous contractual provisions (including the inability to sell their businesses for fair value),

and threats of litigation and, in turn, more costs, make it economically prohibitive to escape from the 20-year term resulting in long-term indentured servitude.

66.     Defendants' practices of intentionally and unreasonably marking up Items used by U.S. franchisees and receiving exorbitant rebates are directly contrary to RBI's own public statements. In the Tim Hortons FDDs dating back to RBI's takeover of the brand, Tim Hortons has stated that "we have negotiated purchase agreements with suppliers" and "in doing so, we seek to promote the overall interests of the Tim Hortons System and our interest as the franchisor."

67.     RBI, Tim Hortons and their affiliates receive substantial profits from this scheme.

68.     RBI, Tim Hortons, and its affiliates have been, at all material times, more focused on their own profit and shareholders' stock value than providing a productive and supportive franchise system to its franchisees. Upon information and belief, this scheme has been adopted to inflate RBI's profitability and make it more attractive to potential investors.

69.     As President of Tim Hortons, Mr. Diaz Sese operated and managed Tim Hortons and devised the fraudulent scheme discussed herein. Mr. Diaz Sese operated and managed Tim Hortons and its affiliates in its implementation of the fraudulent scheme.

## RBI STRIPS EQUITY FROM FRANCHISEES

70.     RBI has implemented an insidious "equity stripping" strategy which occurs upon franchise renewal. Starting with franchise renewals in 2017, RBI, through Tim Hortons imposes a "right of first refusal" which requires franchisees to offer their store (or stores) to Tim Hortons for only the five-year declining depreciated value of the furniture, fixture and equipment ("FF&E"). See Franchise Agreement para. 11.02(b) and 11.03(i) which states:

11.02 **Restrictions on the Franchisee's Right to Transfer**

*   *   *

(b) In the event the Franchisee wishes to transfer the Tim Hortons Shop business carried on at the Premises pursuant to this Agreement, the Franchisee shall do so only by first offering to resell the Tim Hortons Shop business to the Franchisor at the depreciated value of the furniture, equipment, signs and improvements. For the purposes hereof, "depreciated value," shall be as defined in subparagraph 12.03(i). The Franchisor shall have the option of repurchasing said business in accordance with this subsection within thirty (30) days of receipt of written notice from the Franchisee advising it wishes to sell the business.

11.03 **The Franchisor's Consent to the Franchisee's Request for Transfer**
(i): the Franchisor shall have the right to purchase from the Franchisee all or part of the assets, furniture, fixtures, equipment and signs owned by the Franchisee and used in the business by paying to the Franchisee the depreciated value thereof. The depreciated value shall be calculated on a declining balance basis of accounting at the rate of twenty percent (20%) per annum with respect to the Development Value of the assets, furniture, fixtures, equipment and signs.

71.     The five year "declining depreciated basis" option price to Tim Hortons is nothing more, nor less, than a forced forfeiture of franchisee equity and the blatant theft of the goodwill value of the business which franchisee members of the Association worked many years to establish. In effect, Tim Hortons franchisees are forced to leave the system with nothing except the value of the equipment in their stores.

## RBI MISAPPROPRIATES ADVERTISING FUND MONIES

72.     All Tim Hortons U.S. franchisees are required to contribute a portion of monthly sales to a system advertising fund called the Tim's National Advertising Programs Inc. ("TNAP") and also referred to in the franchise agreements and herein as the "Advertising Fund".

73.     The Advertising Fund historically played an important role in developing and preserving the Tim Hortons brand for the primary benefit of the franchisees. The Advertising Fund is intended to maximize general public recognition, acceptance and use of the Tim Hortons brand.

74.     All contributions to the Advertising Fund and any earnings, are to be used by Tim Hortons exclusively to meet the costs of maintaining, administering, directing, conducting and developing advertising, marketing, public relations, and/or promotional programs and materials,

and any other activities and related investments and/or initiatives including, for example, capital investments believed to enhance the image of the Tim Hortons system, the cost of preparing and conducting advertising campaigns with various media including the Internet, preparing direct mail advertising, market research, employing advertising and/or public relations agencies to assist with these activities, purchasing promotional items, conducting and administering product introductions, and providing promotional and other marketing materials and services.

75.     After RBI acquired Tim Hortons and its Canadian counterpart TDL, RBI has used various strategies to extract more money out of the Tim Hortons franchise system at the expense of franchisees. One such strategy has been to use the Advertising Fund in ways in which said funds had never been historically or contractually permitted.

76.     RBI has funneled money to itself, Tim Hortons and TDL at the wrongful expense of U.S. franchisees.

77.     Each version of the franchise agreement signed by U.S. franchisees requires the U.S. franchisees to contribute a certain percentage of its restaurant's sales to the Advertising Fund controlled and operated by Tim Hortons.  The Advertising Fund contribution is currently four percent (4%) of sales.

78.     Funds paid to the Advertising Fund by U.S. franchisees are required to be separately accounted for from Tim Hortons' other monies and are not allowed to be used to defray any expenses, except for the reasonable costs and overhead, if any, incurred by Tim Hortons in activities related to the administration or direction of the Advertising Fund and advertising programs.

79. Tim Hortons is required to prepare audited financial statements for the Advertising Fund and provide same to franchisees upon request. If there is a surplus, expenditures during the following year are required to be made first from funds contributed during the previous year.

80. Tim Hortons has not provided audited financials of TNAP since year-end December 31, 2016, despite requests for 2017 and 2018 year-end financials. Tim Hortons, through TNAP, collected $28,731,000 in member assessments from U.S. franchisees and, at year end, had $8,482,000 including $7,137,000 in cash in 2016.

81. The annual contributions of the Advertising Fund, controlled by Tim Hortons, represents a large pool of funds, which, if used to cover the costs of corporate expenses, would enhance Tim Hortons' financial performance, RBI's stock price and the executive compensation received by RBI's executives to the detriment of U.S. franchisees.

82. Immediately following the takeover by RBI implementing 3G's widely known cost-cutting and profit-increasing methods, Tim Hortons started implementing several changes to the administration of the Advertising Fund. These changes included charging operational and administrative expenses with no relation to the TNAP or advertising efforts to promote the U.S. franchisees.

83. Following the change to RBI's executive management, the administrative expenses paid out of the Advertising Fund significantly increased for various reasons:

> (a) Advertising Fund monies were used to pay employees that were previously paid through general operating revenues and whose roles and responsibilities had little or nothing to do with administering the TNAP;
>
> (b) Advertising Fund monies were used to hire RBI analysts analyzing operational data points despite having little or nothing to do with the TNAP;

    (c)  Advertising Fund monies were used by RBI for costs of Tim Hortons franchisee training which was an expense previously borne by the operating budget;

    (d)  Advertising Fund monies were used for research and development by RBI;

    (e)  Advertising Fund monies were used for customer service functions and evaluating Tim Hortons franchisees;

    (f)  Advertising Fund monies were used to private label products and for grocery store listings to allow RBI to sell through non-franchised channels in direct competition with Tim Hortons U.S. franchisees; and

    (g)  Advertising Fund monies were used for expenses related to pre-loaded debit cards known as "TimCards".

84.    Tim Hortons' funneling of money out of the Advertising Fund following RBI's takeover is in breach of the franchise agreements with all members of the Association.

85.    Section 8.02(d) of the franchise agreements states that the Advertising Fund "shall not be used to defray any of the Franchisor's general operating expenses, except for such reasonable administrative personnel and overhead costs on a fully allocated basis as the Franchisor may incur for activities related to the administration or direction of the Advertising Fund, which the Franchisor shall be entitled to recover from the Advertising Fund."

## ASSOCIATIONAL STANDING

86.    The Association  has standing to maintain this action. At least one of its members (indeed, all its members) will suffer an injury-in-fact by the real and immediate, threatened harm from Defendants' conduct.

87.     Further, the interests sought to be protected by this action are germane to the Association's purpose: the rights of Tim Hortons franchisees to prevent Defendants from unfairly and unilaterally modifying the terms of the franchise agreements and the relationship of the parties and to change system standards in a manner so as to render the terms of the parties' franchise contracts commercially unfair and impracticable.

88.     Pursuant to Article III of the Association's Articles of Incorporation, the Association's purpose is:

> "TO PROVIDE A COMMON INTEREST ORGANIZATION FOR TIM HORTONS FRANCHISEES, CREATING A FORUM FOR DISCUSSION, EDUCATION AND ADVOCACY FOR FRANCHISE OWNERS"

89.     Neither the claims asserted herein nor the relief requested requires the participation of individual members in the Association because the Association can prove its allegations herein through Defendants' own internal documents and data, as well as via expert testimony, if necessary. The claim for relief involves issues which are common to all members in the Association and do not require determination on an individual basis.

90.     The Association retained the undersigned counsel and has agreed to pay its attorneys a reasonable fee for providing representation in the above-styled case.

91.     All conditions precedent to bringing this action have occurred, have been waived, or have been otherwise satisfied.

92.     This action seeks declaratory relief as there is a bona fide dispute as to the rights of the Association's franchisees with regard to the relationship with Defendants under the laws and contracts addressed herein; the Association's franchisee members have doubt about their rights and privileges under the law and contract; and the Association has the right to have the doubt removed on behalf of its franchisee members.

**COUNT I**
**DECLARATORY RELIEF UNDER CIVIL RICO (18 U.S.C. §1962(C))**
**(FRAUDULENT SCHEME TO SELL ESSENTIAL GOODS AT INFLATED PRICES)**

93.     The Association repeats and re-alleges paragraphs 1 through 92 above as if set forth in full herein.

94.     This claim, which alleges a violation of 18 U.S.C. §1962(c), is asserted by the Association.

95.     Mr. Diaz Sese and John Does 1-20 are "persons," as that term is defined in 18 U.S.C. §1961(3).

96.     For purposes of the RICO claims, the RICO "enterprise" is an ongoing and continuing association-in-fact consisting of RBI, Tim Hortons, TDL and TDH (the "Enterprise"), formed by Mr. Diaz Sese and the John Does 1-20 (the "Individual Defendants") for the common or shared purpose of conceiving a fraudulent scheme of providing exorbitantly marked up necessary Items for restaurant operation to the Association's Tim Hortons franchisee members in the U.S. as the sole supplier thereby deriving multi-millions of dollars profits from those activities and inflating the RBI stock price (the "Fraudulent Scheme").

97.     Upon information and belief, and at all relevant times, the Individual Defendants, as corporate employees who are separate and distinct from the Enterprise under the law, conducted the Enterprise's affairs through an unlawful pattern of racketeering activity and used the Enterprise as a vehicle to perpetrate the Fraudulent Scheme over an approximate five-year period, which was intended to defraud the Association's franchisee members and further the Fraudulent Scheme.

98.     During this approximate five-year period and continuing through the date of filing and into the future, the Individual Defendants used, continue to use and will continue to use the

U.S. mails and interstate wire facilities through the Enterprise to perpetrate their Fraudulent Scheme.

99.     During this approximate five-year period, and in furtherance of their Fraudulent Scheme, the Individual Defendants used the Enterprise which submitted or caused to be submitted to the Association's franchise members, via facsimile, electronic mail, through other electronic means, over interstate telephone wires and by first-class U.S. mail, agreements and invoices. The invoices were faxed, mailed, and/or otherwise disseminate mailed to the Association's members routinely and systematically.

100.     The Individual Defendants are liable "persons'" as they knowingly and intentionally mailed, faxed, or caused to be mailed or faxed these fraudulent invoices, with the intent to induce the Association's franchise members to make inflated payments to the Enterprise.

101.     The Association's franchisee members reasonably relied on the fraudulent invoices and submitted documents to their detriment and paid or were defrauded by the artificially inflated invoices sent to them. The Association's franchisee members had no choice but to capitulate to the Enterprise's Fraudulent Scheme as the sole supplier for necessary Items to operate their businesses.

102.     The wrongful acts described herein constitute wire fraud under 18 U.S.C. §1343.

103.     The wrongful acts described herein constitute mail fraud under 18 U.S.C. §1341.

104.     During this approximate five-year period, the Individual Defendants committed numerous acts of wire fraud, indictable under 18 U.S.C. §1343, and mail fraud, indictable under 18 U.S.C. §1341, each of which constitutes "racketeering activity" within the meaning of 18 U.S.C. §1961(1), and all of which collectively constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5).

105.     At all relevant times, the illegal conduct and wrongful practices described herein were carried out by the Individual Defendants, working across state boundaries and in regional offices, who necessarily relied upon the frequent transfer of documents and information, invoices, and funds by the U.S. mails and interstate wire facilities.

106.     The nature and pervasiveness of the Enterprise, which was orchestrated out of the corporate headquarters of RBI in Miami, Florida, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and interstate wire facilities with the assistance of various managers across the country including in Michigan, New York, Ohio and Minnesota, who directly communicated with the Association's franchisee members.

107.     At all relevant times, the use of the U.S. mail and interstate wire facilities to perpetrate the Fraudulent Scheme in furtherance of the Enterprise involved many hundreds of communications, in interstate commerce.

108.     The motive of the Individual Defendants in creating and operating the Enterprise was to fraudulently obtain illegal profits from the Association's franchisee members, in furtherance of the Fraudulent Scheme.

109.     The violations of federal law and the Individual Defendants' pattern of racketeering activity has directly and proximately caused the Association's franchisee members to be injured in their business or property because franchisees in the U.S. have paid millions of dollars for fraudulently marked up Items.

110.     As a result of the violation of 18 U.S.C. §1962(c) as alleged herein, the Association requests declaratory relief available under RICO and this Court's equitable authority. The Individual Defendants violated 18 U.S.C. §1962(c) with the specific intent to defraud, thereby

entitling the Association to a declaration that its franchisee members are entitled to treble damages under 18 U.S.C. §1964(c).

## COUNT II
## DECLARATORY RELIEF UNDER CIVIL RICO (18 U.S.C. §1962(D))
## (CONSPIRACY TO VIOLATE RICO)

111.    The Association repeats and re-alleges paragraphs 1 through 92, and 95 through 109, above as if set forth in full herein.

112.    At all relevant times, the Individual Defendants, and other unknown co-conspirators were associated with the Enterprise and agreed and conspired to violate 18 U.S.C. §1962(c), that is, agreed to conduct and participate directly and indirectly in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §1962(d).

113.    The Individual Defendants objectively manifested, through words and actions, an agreement to participate in the conduct of the affairs of the Enterprise through the commission of two or more predicate acts.

114.    The Individual Defendants agreed to participate in the conduct of the Enterprise's illegal activities.

115.    The Individual Defendants engaged in a conspiracy under RICO through an agreement on the overall objective of the conspiracy to defraud franchisees through the commission of at least two predicate acts.

116.    During an approximate five-year period from the date RBI was formed as the indirect parent of Tim Hortons, and in furtherance of their Fraudulent Scheme, the Individual Defendants used the Enterprise which submitted or caused to be submitted to the Association's franchise members, via facsimile, electronic mail, through other electronic means, over interstate

telephone wires and by first-class U.S. mail, agreements and invoices. The invoices were faxed, mailed, and/or otherwise disseminate mailed to the Association's members routinely and systematically.

117.    During this approximate five-year period and continuing through the date of filing and will continue into the future, the Individual Defendants committed numerous acts wire fraud, indictable under 18 U.S.C. §1343, and mail fraud, indictable under 18 U.S.C. §1341, each of which constitutes "racketeering activity" within the meaning of 18 U.S.C. §1961(1), and all of which collectively constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5).

118.    The Individual Defendants, and unknown co-conspirators', conspiracy to violate 18 U.S.C. §1962(c) was committed with the specific intent to defraud, thereby entitling the Association to a declaration that its franchisee members are entitled to treble damages under 18 U.S.C. §1964(c).

### COUNT III
### DECLARATORY RELIEF UNDER SHERMAN ACT, 15 U.S.C. §1 *ET. SEQ.* <u>(ILLEGAL TYING AGAINST RBI AND TIM HORTONS)</u>

119.    The Association repeats and re-alleges paragraphs 1 through 92 above as if set forth in full herein.

120.    RBI is one of the world's largest quick service restaurant companies with more than $30 billion in system-wide sales and over 24,000 restaurants in more than 100 countries and U.S. territories.

121.    RBI serves as the holding company for Tim Hortons and its consolidated subsidiaries. Tim Hortons generates revenues from franchise sales to franchisees and from sales

of products to franchisees from its supply chain operation, including manufacturing, procurement, warehousing and distribution.

122.    By its own estimation in its SEC Form 10-K, RBI states that Tim Hortons is one of the largest donut/coffee/tea restaurant chains in North America and the largest in Canada. There are approximately 4,800 Tim Hortons restaurants globally with approximately 725 units in the United States.

123.    These offerings of a typical restaurant, referred to herein as "Items," are necessary for Tim Hortons franchisees to operate their restaurants. Failure to carry the Items would result in termination or retribution from RBI and Tim Hortons.

124.    The Association is comprised of members who have been sold franchises through Tim Hortons franchise agreements. Tim Hortons offers franchises to the public throughout the United States and the world.

125.    Under the terms of the franchise agreements, Tim Hortons exercises complete control over each new franchise including but not limited to operations, equipment, supervision, training and marketing.

126.    The franchise agreements provide Tim Hortons with the right to designate itself or one of its affiliates as the "sole supplier" for any Item. The franchise agreements provide that "all or a significant percentage of Items used or sold by your Shop may be restricted to a single supplier."

127.    There is a market for goods used to operate Tim Hortons restaurants in which RBI and Tim Hortons maintain substantial market power.

128.     There is a separate market of goods associated with the operation of a restaurant and convenience store including, but not limited to, dairy, dry goods, paper goods, beef, chicken, produce, smallwares, and related Items.

129.     RBI and Tim Hortons, and other entities in which they maintain a financial or other ownership interest, completely restrict the Association's franchisee members from purchasing essential Items to operate their restaurants which allows  RBI and Tim Hortons to reap multi-millions of dollars in benefits from its franchisees who have no other option except to purchase from the sole suppliers of essential Items.

130.     RBI and Tim Hortons also reap the financial benefit of approving unaffiliated vendors as the "sole suppliers" from which RBI and Tim Hortons receive millions of dollars in contractual kickbacks and/or rebates.

131.     The franchise agreements signed by the Association's franchisees members effectively precludes Tim Hortons franchisees from utilizing vendors for products which has a sole supplier. The franchise documents only provide a mechanism for franchisees to purchase Items for which Tim Hortons has not approved a sole supplier on the open market.

132.     There are no such Items, which a franchisee learns only after the franchisees have bound themselves to a 20-year franchise relationship.

133.     RBI and Tim Hortons actively conceal the nature of its relationships with its affiliates and unaffiliated approved vendors, including price information of essential Items, in order to lock the franchisees to onerous franchise agreements and then coerce them by tying franchisees to vendor contracts which require their purchase of essential Items sold to them well above market rate and, in the case of certain goods, more than double the market rate.

134.    RBI and Tim Hortons have designated itself and/or its affiliates, including TDL and THD, as the sole supplier for all relevant goods referred herein as Items.

135.    The franchises sold by Tim Hortons is the "tying product."

136.    RBI and Tim Hortons have sufficient economic and market power with respect to the tying product to restrain free competition in the market for the essential Items which are the "tied product" such to create a *per se* violation of federal antitrust law.

137.    RBI and Tim Hortons condition the purchase of the franchises, the "tying product," upon their purchase of essential Items from Tim Hortons itself or one of RBI's affiliates or subsidiaries, in which it maintains a financial interest or an unaffiliated vendor from which Defendants receive a kickback.

138.    RBI and Tim Hortons have wielded their monopolistic leverage by exploiting their dominant position in the quick service restaurant/convenience store market to expand their supply chain operations, including manufacturing, procurement, warehousing and distribution from which it profits in the multi-millions each year.

139.    This coercive scheme by Defendants strikes at the heart of federal antitrust policy, i.e., the preservation of free and unfettered competition in the marketplace. Defendants' coercive scheme has anticompetitive effects in the tied market, specifically, the market for everyday goods and Items used by Tim Hortons' franchisees to operate their restaurants.

140.    A substantial amount of interstate commerce in essential Items required to operate a Tim Hortons franchised Restaurant, the tied product market, has been adversely affected. Defendants' practices impose an unreasonable negative effect on competition in the marketplace, because of Defendants' policy of coercing and conditioning the purchase and operation of a franchise upon the purchase of essential Items in ways that include a foreclosure of the ability of

vendors unwilling to pay kickbacks and rebates to RBI and Tim Hortons from selling their products and materials to the Association's franchisee members even though the quality of such products and materials is equal to if not better than the quality of what is supplied by the approved "sole suppliers" of certain essential Items.

141.    For example, the Association's franchisee members pay significantly above-market rates, at minimum thirty percent (30%), for its dairy products supplied by RBI's sole supplier, Superior Dairy. Other dairies which have quality milk and creamers available for purchase for market-rate or under market/wholesale rate, are precluded from supplying the same quality product or better to the hundreds of Tim Hortons franchised restaurants despite offering the same product at a lower cost.

142.    RBI and Tim Hortons' tying of its franchises to products and materials from sole suppliers imposes an unreasonable restraint upon commerce and is, therefore, *per se* unlawful and in violation of Section One of the Sherman Act, 15 U.S.C. §1.

143.    Alternatively, if the tying conduct of RBI and Tim Hortons is not *per se* unlawful, it is unlawful under the rule of reason in that the anti-competitive consequences of RBI and Tim Hortons' conduct outweigh any pro-competitive effects thereof. The conduct engaged in by all Defendants together is unconscionable and has resulted in millions of dollars in profits off the backs of franchisees and has impeded the ability of other suppliers to engage in competition with Defendants, their affiliates, and their unaffiliated approved vendors. There is no pro-business or efficiency justification for kickbacks and supra-competitive pricing on essential everyday Items nor does any legitimate business purpose require these practices.

144.    As a direct and proximate result of Defendants' anti-competitive tying activity, the Association's franchisee members have been injured by being forced to pay supra-competitive

prices for essential Items. The Association's franchisee members pay millions of dollars in excess of the market value of the essential Items each year.

145.     The Association, on its members' behalf, is demanding declaratory relief which is an equitable remedy available under the Sherman Act Section 4, 15 U.S.C. §4, which invests district courts with broad equitable power to prevent and restrain violations of antitrust laws, as well as attorney's fees and costs of bringing this action.

**COUNT IV**
**DECLARATORY RELIEF UNDER FLA. STAT. §542.15 *ET SEQ.***
**(ILLEGAL TYING AGAINST RBI AND TIM HORTONS)**

146.     The Association repeats and re-alleges paragraphs 1 through 92, and 120 through 145 as if set forth in full herein.

147.     There exist two separate products: the tying product which is the sale of the Tim Hortons franchise and the tied product which is the sale of essential Items required to operate the franchise.

148.     There is actual coercion by RBI and Tim Hortons which force the Association's franchisee members to purchase the tied product.

149.     RBI and Tim Hortons have sufficient economic and market power with respect to the tying product to restrain free competition in the market for the essential Items which are the "tied product" such to create a violation of Florida antitrust law where RBI and Tim Hortons maintain their headquarters and make pricing and supply chain decisions that affect its franchised restaurants nationwide.

150.     RBI and Tim Hortons' coercive scheme involves a substantial amount of interstate commerce in the tied product market as products are purchased and shipped across state lines to Tim Hortons' franchised restaurants from suppliers nationwide.

151.    As a direct and proximate result of Defendants' anti-competitive tying activity, the Association's franchisee members have been injured by being forced to pay supra-competitive prices for essential Items. The Association, on its members' behalf, is demanding declaratory relief which is an equitable remedy available under the Florida Antitrust Act, Fla. Stat. §542.23.

152.    The Association's franchisee members pay millions of dollars in excess of the market value of the essential Items each year.

153.    As a direct and proximate result of Defendants' anti-competitive tying activity, the Association's franchisee members have been injured by being forced to pay supra-competitive prices for essential Items. The Association's franchisee members pay millions of dollars in excess of the market value of the essential Items each year.

154.    The Association, on its members' behalf, is demanding declaratory relief which is an equitable remedy available under Florida Antitrust Act, Fla. Stat. §542.23, as well as attorney's fees and costs of bringing this action.

## COUNT V
## DECLARATORY RELIEF FOR BREACH OF CONTRACT
## (MISAPPROPRIATION OF ADVERTISING FUND AGAINST TIM HORTONS)

155.    The Association repeats and re-alleges paragraphs 1 through 92 as if set forth in full herein.

156.    Each version of the franchise agreement signed by U.S. franchisees requires the U.S. franchisees to contribute a certain percentage of its restaurant's sales to the Advertising Fund controlled and operated by Tim Hortons.

157.    Funds paid to the Advertising Fund by U.S. franchisees are required to be separately accounted for from Tim Hortons' other monies and are not allowed to be used to defray any expenses, except for the reasonable costs and overhead, if any, incurred by Tim Hortons in

activities related to the administration or direction of the Advertising Fund and advertising programs.

158.     Tim Hortons is required to prepare audited financial statements for the Advertising Fund and provide same to franchisees upon request. If there is a surplus, expenditures during the following year are required to be made first from funds contributed during the previous year.

159.     The franchise agreements signed by each of the Association's franchisee members contain a provision that Advertising Fund money "shall not be used to defray any of the Franchisor's general operating expenses, except for such reasonable administrative personnel and overhead costs on a fully allocated basis as the Franchisor may incur for activities related to the administration or direction of the Advertising Fund, which the Franchisor shall be entitled to recover from the Advertising Fund."

160.     The franchise agreements signed by each of the Association's franchisee members contain a provision that the Advertising Fund and all contributions thereto, and any earnings thereon, shall be used exclusively to meet any and all costs of maintaining, administering, directing, conducting, and developing advertising, marketing, public relations, and/or promotional programs and materials, and any other activities and related investments and/or initiatives, including but not limited to capital investments, which Tim Hortons believes will enhance the image of the "TIM HORTONS SYSTEM," including, among other things, the costs of preparing and conducting advertising campaigns in various media including the Internet; preparation of direct mail advertising; market research; employing advertising and/or public relations agencies to assist therein; purchasing promotional items; conducting and administering product launches; and providing promotional and other marketing materials and services.

161.     Tim Hortons breached its obligations to the Association's franchisee members in ways that include the following:

(a) Advertising Fund monies were used to pay employees that were previously paid through general operating revenues and whose roles and responsibilities had little or nothing to do with administering the TNAP;

(b) Advertising Fund monies were used to hire RBI analysts analyzing operational data points despite having little or nothing to do with the TNAP;

(c) Advertising Fund monies were used by RBI for costs of Tim Hortons franchisee training which was an expense previously borne by the operating budget;

(d) Advertising Fund monies were used for research and development by RBI;

(e) Advertising Fund monies were used for customer service functions and evaluating Tim Hortons franchisees;

(f) Advertising Fund monies were used to private label products and for grocery store listings to allow RBI to sell through non-franchised channels in direct competition with Tim Hortons U.S. franchisees; and

(g) Advertising Fund monies were used for expenses related to pre-loaded debit cards known as "TimCards".

162.     Tim Hortons' funneling of money out of the Advertising Fund following RBI's takeover is in breach of the franchise agreements with all members of the Association. Section 8.02(d) states that the Advertising Fund "shall not be used to defray any of the Franchisor's general operating expenses, except for such reasonable administrative personnel and overhead costs on a fully allocated basis as the Franchisor may incur for activities related to the administration or

direction of the Advertising Fund, which the Franchisor shall be entitled to recover from the Advertising Fund."

163.    Despite the requirement upon request, Tim Hortons has not provided TNAP audited financials since year-end December 31, 2016.

164.    As a direct and proximate result of Tim Hortons' breach of the franchise agreements executed by each of the Association's franchisee members, said members have been damaged.

165.    Accordingly, the Association, on its franchisee members' behalf, seeks a declaration from the Court that Tim Hortons has breached its duties to its franchisees in any or all of the manners alleged herein plus attorney's fees and costs available under the franchise agreements and/or Florida law.

**COUNT VI**
**DECLARATORY RELIEF UNDER FDUTPA, FLA. STAT. §501.201 *ET SEQ.***
**(VIOLATIONS AGAINST TIM HORTONS AND INDIVIDUAL DEFENDANTS)**

166.    The Association repeats and re-alleges paragraphs 1 through 92 as if set forth in full herein.

167.    This is an action for violation of the Florida Deceptive and Unfair Trade Practices Act, Sections 501.201 *et seq.*, Florida Statutes ("FDUTPA").

168.    At all times material to this action, the Association's franchisee members were "consumers" as that term is defined under FDUTPA, Section 501.2011(7), Florida Statutes.

169.    Section 501.201(3), Florida Statutes, provides that violations of the rules promulgated under the Federal Trade Commission Act are violations of FDUTPA.

170.    Tim Hortons is a "franchisor" as defined in the Amended FTC Franchise Rule, 16 C.F.R. §436.1(k). Certain of the Individual Defendants have substantial operational control over Tim Hortons' operations.

171.   FDUTPA is applicable as the sale of the franchise was made by a Florida franchisor and the fraudulent conduct alleged herein primarily occurred in Florida where Tim Hortons maintains its headquarters and makes decisions which impact the nationwide and global franchise system. FDUTPA has no geographical or residential restrictions.

172.   Tim Hortons committed *per se* violations of FDUTPA by violating the Amended FTC Franchise Rule as follows:

> (a)   Falsely disclosing that the Advertising Fund monies contributed by the Association's franchisee members would be used for purposes related to marketing and advertising purposes in violation of 16 C.F.R. §436.5(k);
>
> (b)   Falsely disclosing that Tim Hortons and/or its affiliates did not receive any payment from the Advertising Fund in violation of 16 C.F.R. §436.5(k);
>
> (c)   Falsely disclosing that no Advertising Fund monies were used for directly soliciting the sales of franchisees in violation of 16 C.F.R. §436.5(k);
>
> (d)   Omitting what is effectively an undisclosed royalty fee collected by Tim Hortons and its affiliates, in the form of markups, rebates and kickbacks, for all of the essential Items needed to operate the restaurants in violation of 16 C.F.R. §436.5(h);
>
> (e)   For certain franchisee members, falsely stating that mark-ups of Items essential to operate the restaurants would be reasonable and, for all members, marking up the price of goods beyond any measure of commercial reasonableness; and
>
> (f)   Falsely under-reporting the amounts of monies earned in revenue by affiliates in the supply chain, including TDL and TDH in violation of 16 C.F.R. §436.5(h).

173.    As franchisor, Tim Hortons engaged in multiple acts of deceptive and unfair practices in violation of FDUTPA including:

(a)   Baiting the Association's franchisees into 20-year agreements at a discount and then crushing them with marked up essential Items for their restaurants;

(b)   Requiring the Association's franchisees to execute and renew long-standing franchise relationships through a franchise agreement that contains a clause located at Section 11, ¶ 11.02 (b) and ¶ 11.03(i), which requires franchisees to offer their shop or shops to RBI for only the five year declining depreciated value of the furniture, fixtures and equipment, and amounts to an unconscionable theft of franchisee good will and equity;

(c)   Continuously marking up product prices to effectively eliminate the ability of its franchisees to turn a profit;

(d)   Utilizing its buying power as one of the largest franchisors in the world solely for the benefit of the franchisor;

(e)   Failing to provide any benefit to franchisee members of the Association with regard to marketing and advertising;

(f)   Misappropriating Advertising Fund monies as alleged herein;

(g)   Gouging franchisees on essential Items to force them to churn out and sell to a Tim Hortons-preferred franchisee; and

(h)   Inflating RBI's stock price and enriching investors on the backs of the Association's franchisee members which pay inflated prices to increase Tim Hortons' supply chain sales figures reported to investors.

174.     As a result of the misrepresentations and conduct described above in violation of FDUTPA, the Association's franchisee members have and will continue in the future to sustain losses and actual damage to their businesses.

175.     The Association herein seeks declaratory relief on behalf of its franchisee members and available under FDUTPA admonishing Tim Hortons for its violations of FDUTPA set forth herein, deeming Tim Hortons' conduct alleged herein as being conducted in violation of FDUTPA, and awarding the Association its attorney's fees and costs.

**COUNT VII**
**DECLARATORY RELIEF FOR BREACH OF FRANCHISE AGREEMENT AND**
**IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(EQUITY STRIPPING AGAINST TIM HORTONS)**

176.     The Association repeats and re-alleges paragraphs 1 through 92 as if set forth in full herein

177.     Under Florida law, declaratory actions are permitted under Fla. Stat. §86.011, *et seq.* where the Court is granted the power to issue judgments declaring the rights and other legal relations of any interested party, whether or not further relief is or could be sought. *See* Fla. Stat. §86.021.

178.     The franchisee members of the Association each entered into franchise agreements with Tim Hortons.

179.     The franchise agreements between Tim Hortons and its franchisees in the Association gives rise to express obligations and also gives rise to a mutual implied covenant of good faith and fair dealing between the parties.

180.     Tim Hortons and RBI have completely ignored the express representations in the Tim Hortons FDD that only a "reasonable" mark-up would be implemented on required purchases of products and services from either Tim Hortons directly or its approved suppliers.

181.    In Item 8 of its FDD, Tim Hortons states:

> …you must purchase or lease all products, fixtures, furnishings, building components, equipment, décor, signs,. Paper goods, containers, cartons, packaging, supplies, and smallwares and other utensils, services, including project management services, product ingredients, insurance and other items installed in used, or sold by the Shop ("**Items**") solely from suppliers who have been approved by us and all these Items must meet our specifications.  We can designate ourselves, our affiliates, or a third party as the sole supplier for any Item. … We and our affiliates may charge what we consider to be a ***reasonable mark-up*** (*emphasis added*) on items sold to you.

182.    Under the covenant of good faith and fair dealing inherent in every contract under Florida law, each party has an obligation and duty to act fairly towards the other, to do nothing destructive of the other party's right to enjoy the fruits of the contract, and to do everything that the contract presupposes they will do to accomplish its purpose.

183.    The obligations of Tim Hortons to abide by the implied covenant of good faith and fair dealing is heightened by the substantial imbalance of power between Tim Hortons and its franchisees in the Association, which imbalance allows Tim Hortons to, for example, implement RBI's business scheme and private equity strategy.

184.    Certain bona fide disputes have arisen between the Association on behalf of its franchisee members, on the one hand, and Tim Hortons, on the other, arising out of and relating to the franchise agreements and the covenant of good faith and fair dealing inherent in the franchise agreements  including, but not limited to, the following:

(a) Whether Tim Hortons breached the franchise agreements by forcing franchisees to purchase supplies from their supplier which marked-up goods when the franchise agreements provide that said materials may be purchased from any source;

38

(b) Whether the mark-ups on Items were commercially unreasonable and/or breached the implied covenant of good faith and fair dealing inherent in the franchise agreements;

(c) Whether RBI and Tim Hortons' mark-ups on millwork from a single vendor for purposes of re-modelling the Association's franchisee members' stores were commercially unreasonable and/or breached the implied covenant of good faith and fair dealing inherent in the franchise agreements;

(d) Whether Tim Hortons' control over the retail prices in the franchise agreements signed by the Association's franchisee members and keeping them low to drive traffic, combined with the mark-ups of food supplies through RBI's private equity strategy breached the implied covenant of good faith and fair dealing inherent in the franchise agreements;

(e) Whether the franchise agreement Section 11.02(b) requiring that franchisees in the Association must, before selling for value to a third party, first offer to re-sell the assets of the franchised business (furniture, equipment, signs and improvements) at a depreciated value on a declining basis of accounting at the rate of twenty percent (20%) per annum is unconscionable and therefore unenforceable under applicable Florida law; and

(f) Whether the franchise agreement Section 12.03(i) requiring that franchisees in the Association must sell to the franchisor all or part of the assets, furniture, fixtures, equipment and signs owned by the franchisees and used in the business for a depreciated value on a declining basis of accounting at the rate of twenty

percent (20%) per annum upon expiration of the franchise agreements is

unconscionable and therefore unenforceable under applicable Florida law.

185.     There is an actual and present need for a declaration regarding the meaning of the

subject franchise agreements between Tim Hortons and the Association's franchisee members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Great White North Franchise Association-USA, Inc., on behalf

of its franchisee members, requests a declaration of its rights and obligations under the applicable

law and agreements. In particular, Plaintiff requests that the Court enter a judgment declaring that:

1.     The Individual Defendants conducted the Enterprise's affairs through an unlawful

pattern of racketeering activity as a vehicle (as discussed in *Cedric Kushner Promotions, Ltd. v.

King*, 533 U.S. 158 (2001) and *Viridis Corp. v. TCA Glob. Credit Master Fund, LP*, 155 F. Supp.

3d 1344, 1360 (S.D. Fla. 2015) in violation of 18 U.S.C. §1962(c) as alleged in Count I;

2.     The Individual Defendants, and unknown co-conspirators conspired to violate 18

U.S.C. §1962(c) in violation of 18 U.S.C. §1962(d) as alleged in Count II;

3.     Tim Hortons and RBI have violated the Sherman Act, 15 U.S.C. §1 as alleged in

Count III;

4.     Tim Hortons and RBI have violated the Florida Antitrust Law, Fla. Stat. §542.15

as alleged in Count IV;

5.     Tim Hortons has breached the franchise agreements by misappropriating monies

paid into the Advertising Fund as alleged in Count V;

6.     Tim Hortons, all of the Individual Defendants who have operational control over

the franchisor, have violated FDUTPA, Fla Stat. §501.201 in the manners alleged in Count VI;

7.      Tim Hortons has breached the franchise agreements' implied covenant of good faith and fair dealing inherent in the franchise agreements by stripping franchisee owners' equity and goodwill from their restaurants and all other manners alleged in Count VII;

8.      The Association's members shall be entitled to seek their actual and exemplary damages, either through individual lawsuits and/or a class action lawsuit;

9.      The Association is the prevailing party, and Defendants shall pay all reasonable attorneys' fees and costs incurred by Association in prosecuting this action on behalf of its members as available under applicable law and/or contract ; and

10.     All other relief this Court deems just and proper under the circumstances.

Dated: February 27, 2020

**WASCH RAINES LLP**

/s/ *Adam Wasch*
Adam G. Wasch, Esq.
Florida Bar No. 071082
awasch@waschraines.com
Natalie M. Restivo, Esq.
Florida Bar No. 1002569
nrestivo@waschraines.com
2500 N. Military Trail, Suite 303
Boca Raton, Florida 33431
T: (561) 693-3221
F: (561) 404-1104
*Attorneys for Plaintiff*

and

**MARKS & KLEIN, LLP**

Gerald A. Marks, Esq.
63 Riverside Avenue
Red Bank, N.J. 07701
Tel: (732) 747-7100
Fax: (732) 219-0625
*Attorneys for Plaintiff*
*Pro Hac Vice* (Admission Pending)