# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 20-cv-20878-BLOOM/Louis

GREAT WHITE NORTH FRANCHISEE
ASSOCIATION-USA, INC.,

      Plaintiff,

v.

TIM HORTONS USA, INC.,
*et al.*,

      Defendants.

_____/

## OMNIBUS ORDER ON MOTIONS TO DISMISS

**THIS CAUSE** is before the Court upon Defendant Tim Hortons USA, Inc.'s ("THUSA")
Motion to Dismiss Second Amended Complaint with Prejudice, ECF No. [67] ("THUSA
Motion"), and Defendant Jose E. Cil's ("Cil") Motion to Dismiss Second Amended Complaint
with Prejudice, ECF No. [68] ("Cil Motion").[1] The Court has carefully considered the THUSA
Motion and Cil Motion (together, the "Motions"), all opposing and supporting submissions,
including Plaintiff Great White North Franchisee Association-USA, Inc.'s ("Plaintiff" or
"Association") responses, ECF Nos. [71], [72], and Defendant THUSA's and Defendant Cil's
(together, "Defendants") replies, ECF Nos. [77], [78], the record in this case, the applicable law,
and is otherwise fully advised. For the reasons set forth below, the Motions are granted in part.

---

[1] Defendant Cil has adopted the arguments made by Defendant THUSA in its Motion. *See* ECF No. [68] at
2.

## I.    BACKGROUND

This case involves an allegedly illegal and predatory business scheme implemented by THUSA's holding company to convert the Tim Hortons franchise system into a supply chain business resulting in large profits at the expense of Plaintiff's franchisee members.

Tim Hortons restaurants are quick service restaurants with a convenience store element that includes, coffee, tea, espresso-based hot and cold drinks, baked goods, and items typically found at a convenience store. *See* Second Amended Complaint ("SAC"), ECF No. [62] ¶ 12. Plaintiff is a not-for-profit franchisee association that was formed as a direct result of its members' common grievances with respect to certain practices and operations of Defendants. *Id*. ¶¶ 8-9. Plaintiff was organized and exists for the purpose of protecting and preserving the rights of Tim Hortons U.S. franchisees and was created to serve as an official voice of the Tim Hortons U.S. franchisee community. *Id.* ¶ 10. As stated in the Association's Articles of Incorporation, the Association's purpose is "[t]o provide a common interest organization for Tim Hortons franchisees, creating a forum for discussion, education and advocacy for franchise owners." *Id*. ¶ 74.

In the SAC, Plaintiff alleges that non-party Restaurant Brand International, Inc. ("RBI"), THUSA's holding company, was formed upon purchasing the Tim Hortons franchise system in 2014. *Id*. ¶¶ 1-2. In an apparent attempt to off-set the brand growth in the U.S. and stagnant sales in both the U.S. and Canada, RBI commenced its predatory strategy to convert the Tim Hortons franchise system into a supply chain business disguised as a franchise system and reaped outrageous profits through its supply chain. *Id.* ¶ 3 This was done by price-gouging U.S. franchisees on all essential goods necessary to operate their Tim Hortons restaurants. *Id.* Cil operated and managed RBI, THUSA, and its affiliates in the implementation of the business

practices at issue in this case and had substantial operational control over THUSA operations. *Id.* ¶¶ 54, 84.

Plaintiff alleges that RBI set up a vertically integrated supply chain for its Tim Hortons business, through which RBI manufactures, warehouses, and distributes most of the food and restaurant supplies to Plaintiff's franchisee members. *Id.* ¶ 25. For example, TDL Group Corp. ("TDL"), THUSA's Canadian affiliate and primary supplier under RBI, imports and sells certain essentials ("Selected Goods") for everyday operations to THUSA, which in turn either directly or through a distributor re-sells those items to a U.S. franchisee for a profit. *Id.* ¶¶ 31-32, 34. Since RBI's takeover, Tim Hortons franchisees have been forced to purchase more items from THUSA, or a newly designated sole supplier, at substantial mark-up from market rate. *Id.* ¶ 37. THUSA engages in a similar practice with respect to equipment, which results in sales of equipment to U.S. franchisees at double mark-up. *Id.* ¶ 39. Similarly, THD, the affiliate utilized by RBI to serve as master coffee supplier to THUSA franchisees, sells coffee to THUSA franchisees for approximately 50% more for the same quality coffee than close competitors. *Id.* ¶¶ 46, 50.

Plaintiff alleges that RBI has implemented an "equity stripping" strategy that occurs upon franchise renewal, in that THUSA's franchise agreements contain a right of first refusal requiring existing franchisees to offer their store(s) to THUSA for the five-year declining depreciated value of furniture, fixtures, and equipment. *Id.* ¶ 57.

Plaintiff further alleges that all THUSA franchisees are required to contribute a portion of monthly sales into an "Advertising Fund" referred to in the franchise agreements. *Id.* ¶ 60. The contributions to the Advertising Fund and any earnings are to be used by THUSA exclusively for costs of maintaining, administering, directing, conducting and developing advertising, marketing, public relations, and/or promotional programs and materials, and any other activities and related

investments and/or initiatives. *Id.* ¶ 62. Since acquisition by RBI, the Advertising Fund has been used in ways not historically or contractually permitted. *Id.* ¶ 63. For example, Plaintiff alleges that monies from the Advertising Fund were used to improperly pay employees, hire RBI analysts to analyze operational data points, for costs of THUSA franchisee training, for research and development by RBI, for customer service functions and evaluating THUSA franchisees, to private label products and for grocery store listings to allow RBI to sell through non-franchised channels and compete directly with THUSA franchisees, and for expenses related to pre-loaded debit cards known as "TimCards." *Id.* ¶ 69.

As a result, Plaintiff asserts two claims for declaratory and injunctive relief based upon violations of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Florida Statutes §§ 501.201, *et seq*. In Count 1, Plaintiff asserts *per* se violations of FDUTPA premised upon violations of the FTC Franchise Rule regarding certain disclosures or omissions in the franchise documents, and in Count 2, Plaintiff's FDUTPA claim is premised upon THUSA's and Cil's alleged predatory business schemes. THUSA and Cil request dismissal with prejudice of the SAC, claiming that Plaintiff lacks standing and fails to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II.   LEGAL STANDARD

### A.  Standing

One element of the case-or-controversy requirement under Article III of the United States Constitution is that plaintiffs "must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). It is a threshold question of "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Sims v. Fla. Dep't of Highway Safety & Motor Vehicles*, 862 F.2d 1449, 1458 (11th Cir. 1989) (*en banc*). "'The law of Article III

standing . . . serves to prevent the judicial process from being used to usurp the powers of the political branches,' and confines the federal courts to a properly judicial role." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013); *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Further, "standing requirements 'are not mere pleading requirements but rather [are] an indispensable part of the plaintiff's case.'" *Church v. City of Huntsville*, 30 F.3d 1332, 1336 (11th Cir. 1994) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "Indeed, standing is a threshold question that must be explored at the outset of any case." *Corbett v. Transp. Sec. Admin.*, 930 F.3d 1225, 1232 (11th Cir. 2019) (citing *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005)), *cert. denied*, 140 S. Ct. 900 (2020). "In its absence, 'a court is not free to opine in an advisory capacity about the merits of a plaintiff's claim.'" *Id.* (quoting *Bochese*, 405 F.3d at 974). "In fact, standing is 'perhaps the most important jurisdictional' requirement, and without it, [federal courts] have no power to judge the merits." *Id.* (footnote omitted) (quoting *Bochese*, 405 F.3d at 974).

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision."

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 472 (1982) (quoting *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99 (1979)). In other words, to establish standing, a plaintiff must allege that: (1) it "suffered an injury in fact that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;" (2) "the injury is fairly traceable to conduct of the defendant;" and (3) "it is likely, not just merely speculative, that the injury will be redressed by a favorable decision." *Kelly v. Harris*, 331 F.3d 817, 819-20 (11th Cir. 2003).

"The party invoking federal jurisdiction bears the burden of proving standing." *Fla. Pub. Int. Rsch. Grp. Citizen Lobby, Inc. v. E.P.A.*, 386 F.3d 1070, 1083 (11th Cir. 2004) (quoting *Bischoff v. Osceola Cnty.*, 222 F.3d 874, 878 (11th Cir. 2000)). "Because standing is jurisdictional, a dismissal for lack of standing has the same effect as a dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)." *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1203 n.42 (11th Cir.1991). "If at any point in the litigation the plaintiff ceases to meet all three requirements for constitutional standing, the case no longer presents a live case or controversy, and the federal court must dismiss the case for lack of subject matter jurisdiction." *Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1302 (11th Cir. 2011) (citing *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1277 (11th Cir. 2006)). "In assessing the propriety of a motion for dismissal under Fed. R. Civ. P. 12(b)(1), a district court is not limited to an inquiry into undisputed facts; it may hear conflicting evidence and decide for itself the factual issues that determine jurisdiction." *Colonial Pipeline Co. v. Collins*, 921 F.2d 1237, 1243 (11th Cir. 1991). "When a defendant properly challenges subject matter jurisdiction under Rule 12(b)(1) the district court is free to independently weigh facts, and 'may proceed as it never could under Rule 12(b)(6) or Fed. R. Civ. P. 56.'" *Turcios v. Delicias Hispanas Corp.*, 275 F. App'x 879, 880 (11th Cir. 2008) (quoting *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003)).

**B. Rule 12(b)(6)**

Rule 8 of the Federal Rules requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). In the same vein, a complaint may not rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (alteration in original)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. These elements are required to survive a motion brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which requests dismissal for failure to state a claim upon which relief can be granted.

When reviewing a motion under Rule 12(b)(6), a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration All.*, 304 F.3d 1076, 1084 (11th Cir. 2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009). However, this tenet does not apply to legal conclusions, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *see Iqbal*, 556 U.S. at 678; *Thaeter v. Palm Beach Cnty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006). A court considering a Rule 12(b) motion is generally limited to the facts contained in the complaint and attached exhibits, including documents referred to in the complaint that are central to the claim. *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009); *see also Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 (11th Cir. 2005) ("[A] document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity.") (citing *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002)).

### III.   DISCUSSION

In the Motions, Defendants mount a facial attack on the Court's subject matter jurisdiction, arguing that Plaintiff lacks associational standing to assert claims on behalf of its members, a group of THUSA franchisees.

### A.  Associational Standing

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014). "The possibility of such representational standing, however, does not eliminate or attenuate the constitutional requirement of a case or controversy." *Warth*, 422 U.S. at 511.

In the SAC, Plaintiff seeks injunctive and declaratory relief under FDUTPA on behalf of its members for Count 1, asserting violations of the FTC Franchise Rule; and Count 2, asserting violations of FDUTPA based upon Defendants' specific deceptive practices. *See* ECF No. [62], Prayer for Relief ¶¶ 1-2.

### i.   Count 1 – *per se* violations of FDUTPA

Defendants argue that Plaintiff lacks standing because (1) the Association's members do not have standing to seek declaratory and injunctive relief for violations of the FTC Franchise Rule arising from alleged misrepresentations in the current Franchise Disclosure Document ("FDD"), which they will not be provided in the future; (2) the interests sought to be protected in Count 1

are not germane to the Association's purpose; and (3) the participation of the Association's individual members will be required.[2] The Court considers each argument in turn.

According to Defendants, Plaintiff must establish that its members would have standing to maintain the action and Plaintiff's conclusory allegations are insufficient. In the SAC, Plaintiff alleges in that "[a]t least one of its members (indeed, all its members) will suffer an injury-in-fact by the real and immediate, threatened harm from Defendants' conduct." ECF No. [67] at 8 (quoting ECF No. [62] ¶ 72). Defendants argue further that because Plaintiff is seeking injunctive relief, it must also satisfy the requirement of showing a threat of future harm, and Plaintiff cannot because its members are existing franchisees who will not be provided a Tim Hortons FDD in the future. In response, Plaintiff argues that it need not allege future harm of its members, and even if required to, the allegations in the SAC are sufficient. Plaintiff argues further THUSA deliberately misconstrues the claim in Count 1. Thus, the Court considers whether Plaintiff's members have standing to assert Count 1.

### a.  Plaintiff's members do not have standing to assert Count 1

In order to establish Article III standing, an individual member must allege that it suffered an injury in fact. *Spokeo*, 136 S. Ct. at 1547. "Where the plaintiff seeks declaratory or injunctive relief, as opposed to damages for injuries already suffered, . . . the injury-in-fact requirement insists that a plaintiff 'allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future.'" *Strickland v. Alexander*, 772 F.3d 876, 883 (11th Cir. 2014) (quoting *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1346 (11th Cir. 1999)).

---

[2] Defendants also argue, regarding the first prong of the standing inquiry, that because the franchise agreements, which all of Plaintiff's members signed, contain an Ohio choice-of-law provision, Plaintiff's members are barred from asserting FDUTPA claims in the first instance. However, this argument is more relevant to Plaintiff's ability to state a claim, rather than to Plaintiff's standing.

The FDUTPA provides that "anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part." Fla. Stat. § 501.211(1). As is evident from the parties' briefing, courts in this district appear to be split on whether a plaintiff has standing to seek declaratory and injunctive relief under FDUTPA if the plaintiff does not demonstrate a threat of future injury. *Compare Galstaldi v. Sunvest Cmtys. USA, LLC*, 637 F. Supp. 2d 1045, 1057 (S.D. Fla. 2009) and *Dye v. Bodacious Food Co.*, No. 14-80627-CIV, 2014 WL 12469954, at \*3 (S.D. Fla. Sept. 9, 2014) with *Dapeer v. Neutrogena Corp.*, 95 F. Supp. 3d 1366, 1373 (S.D. Fla. 2015) and *Seidman v. Snack Factory, LLC*, No. 14-62547-CIV, 2015 WL 1411878, at \*5 (S.D. Fla. Mar. 26, 2015).

In *Galstaldi* and *Dye*, the courts concluded that based upon FDUTPA's broad wording, plaintiffs need not show an ongoing practice or irreparable harm in order to establish standing for injunctive and declaratory relief under FDUTPA. *Galstaldi*, 637 F. Supp. 2d at 1057; *Dye*, 2014 WL 12469954, at \*3-4. However, the court in *Dye* did not specifically address Article III standing, and the court's discussion in *Galstaldi* demonstrates that standing under FDUTPA is a separate inquiry from Article III standing. *See* 637 F. Supp. 2d at 1057-58 ("Any person aggrieved by a violation of the FDUTPA may seek declaratory and/or injunctive relief under the statute. . . . Plaintiffs also satisfy the requirements for threshold standing under Article III."). This distinction is what the court in *Dapeer* explicitly recognized and emphasized.

"Although the FDUTPA allows a plaintiff to pursue injunctive relief even where the individual plaintiff will not benefit from an injunction, it cannot supplant Constitutional standing requirements. Article III of the Constitution requires that a plaintiff seeking injunctive relief allege a threat of future harm." *Dapeer*, 95 F. Supp. 3d at 1373; *see also Ohio State Troopers Assoc, Inc.*

*v. Point Blank Enterps., Inc.*, 347 F. Supp. 3d 1207, 1227 (S.D. Fla. 2018) (where individual plaintiffs failed to show a sufficient likelihood of being affected in the future, association lacked standing). Therefore, Plaintiff's reliance on language from *Galstaldi* regarding the broadness of the FDUTPA is misplaced. Plaintiff's allegations must not only satisfy FDUTPA standing requirements but must also satisfy the threshold requirements for standing under Article III. Upon review, the Court agrees with Defendants that, notwithstanding FDUTPA's broad application, Plaintiff must allege a plausible threat of future harm based upon the alleged disclosure violations in Count 1.

Defendants argue that because Plaintiff's members are existing franchisees and will not be provided franchise disclosure documents in the future, none of Plaintiff's members has standing to seek an injunction to prevent future violations of the FTC Franchise Rule. Plaintiff contends that a violation of the FTC Franchise Rule alleges a plausible *per se* violation of FDUTPA, and that Defendants deliberately misconstrue the claim asserted in Count 1. Thus, the Court looks to the allegations in the SAC.

In Count 1, Plaintiff alleges that its members' injuries arising from Defendants' non-disclosure or misrepresentations consist of excess mark-ups for Selected Goods, loss of equity from Defendant's right of first refusal, and diminished benefits from Defendants' misuse of monies in the Advertising Fund. ECF No. [62] ¶ 89. Plaintiff alleges further that, as a result of the non-disclosures and misrepresentations, "the Association's franchisee members have and will continue to sustain damages and irreparable harm to their businesses." *Id.* ¶ 90. However, as Plaintiff itself points out, the claim in Count 1 is premised upon *per se* FDUTPA violations arising from Defendants' alleged violations of the FTC Franchise Rule, which requires that certain information be provided in a FDD. *See* 16 C.F.R. § 436.5. Therefore, the relevant injurious act in this case is

the failure to comply with the FTC Franchise Rule by making the requisite disclosures or accurate representations, not the three alleged deceptive and unfair practices that form the basis of Count 2. As such, Plaintiff's members' injuries in Count 1 stem from Defendants' past non-compliance with disclosure requirements, not any subsequent actions.

Plaintiff alleges that Defendants made several false disclosures and omissions in the FDD, and therefore has stated a claim for *per se* violations of FDUTPA. However, while the FTC Franchise Rule requires a franchisor to provide a prospective franchisee with a current FDD, *see* 16 C.F.R. § 436.2, there is no ongoing disclosure requirement or requirement that a franchisor provide FDDs to *existing* franchisees. As alleged in this case, Plaintiff is a group of the majority of the *franchisees* in the Tim Hortons restaurant chain in the United States. ECF No. [62] ¶ 1 (emphasis added). Thus, it is not a misreading of the allegations in the SAC to conclude that if Plaintiff's members are already franchisees, as opposed to prospective franchisees, they have already received FDDs. There is no allegation in the SAC to the contrary, nor does Plaintiff argue otherwise. Rather, Plaintiff alleges that the Association's express purpose is "[t]o provide a common interest organization for Tim Hortons *franchisees*, creating a forum for discussion, education and advocacy for *franchise owners*." *Id.* ¶ 74 (emphasis added). Taking these allegations as true, Plaintiff's members are all existing franchisees, and therefore, they will not be provided FDDs again in the future. As such, Plaintiff's allegations of ongoing injury to its members as a result of Defendants' *per se* violations of FDUTPA is a conclusion that is simply not supported by the facts in this case.

Defendants contend that because Plaintiff's members are existing franchisees who will not receive FDDs, the injury-in-fact—the failure to disclose in compliance with the FTC Franchise Rule—is neither sufficiently actual or imminent to satisfy Article III's requirements with respect

to Plaintiff's members. The Court agrees. *See Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1241 (11th Cir. 2003) ("where a plaintiff seeks prospective injunctive relief, it must demonstrate a 'real and immediate threat' of future injury in order to satisfy the 'injury in fact' requirement") (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 103-04 (1983) and *Wooden v. Bd. of Regents*, 247 F.3d 1262, 1283-84 (11th Cir. 2001)). Because Plaintiff cannot plausible allege that its members likely suffer a real and immediate threat from Defendants' future non-compliance with the FTC Franchise Rule, Plaintiff's members lack Article III standing to seek the relief requested. As a result, Plaintiff lacks standing to seek either injunctive or declaratory relief as to Count 1.

### b.  The interests sought to be protected in Count 1 are not germane to Plaintiff's purpose

Defendants argue next that the interests sought to be protected in Count 1 of the SAC are not germane to the Association's purpose and, therefore, Plaintiff cannot satisfy the second prong of associational standing. As alleged in the SAC, Plaintiff's purpose is "[t]o provide a common interest organization for Tim Hortons franchisees, creating a forum for discussion, education and advocacy for franchise owners." ECF No. [62] ¶ 74. Thus, Defendant argues that because the Association is for the benefit of existing franchisees, as opposed to the general public or prospective franchisees, the interests sought to be protected in Count 1 are not germane to the Association's purpose. The Court agrees. Since Plaintiff's members fail to show an injury in fact with respect to Count 1 because they will not receive FDDs in the future, the interests sought to be protected in Count 1 are not the interests of current franchise owners. As a result, Plaintiff fails to satisfy the second prong of associational standing with respect to Count 1.

### c.   Participation of individual members

Because the Court finds that Plaintiff fails to satisfy the first two prongs for associational standing with respect to Count 1, alleging *per se* violations of FDUTPA based upon noncompliance with the FTC Franchise Rule, the Court need not consider whether Plaintiff can satisfy the third prong with respect to Count 1.

As a result, Count 1 is due to be dismissed for lack of standing.

### ii.   <u>Count 2 – unfair and deceptive practices</u>

### a.   Plaintiff's members have standing to assert Count 2

Defendants do not appear to challenge the first prong of associational standing with respect to Count 2 of the SAC. Nevertheless, upon review, the Court finds that with respect to Count 2, Plaintiff's members do have standing to assert claims for declaratory and injunctive relief. Plaintiff's claim in Count 2, unlike Count 1, is premised upon several allegedly deceptive and unfair trade practices that Defendants engaged in after Plaintiff's members had established franchisee relationships with Defendants. According to the SAC, Defendants engage in these practices with respect to franchisees, including marking up prices of Selected Goods, misappropriating Advertising Fund monies, and enacting an equity-stripping policy, and therefore the SAC alleges a real or imminent threat of future injury to Plaintiff's members. As a result, Plaintiff satisfies the first prong of the associational standing inquiry with respect to Count 2.

### b.   The interests sought to be protected in Count 2 are germane to the Association's purpose

The Defendant does not appear to challenge the second prong of associational standing with respect to Count 2. Nevertheless, upon review, the Court determines that in contrast to Count 1, Plaintiff satisfies the second prong with respect to Count 2. The SAC alleges that one of the main purposes of the Association is "advocacy for franchise owners." As previously noted, Count

2 seeks relief for alleged deceptive or unfair practices by Defendants related to the franchise relationship. Accordingly, the allegations in the SAC are sufficient to establish that the interests sought to be protected in Count 2 are germane to Plaintiff's purpose.

### c.   Participation of individual members

Defendants argue that many of Plaintiff's claims of alleged wrongdoing will require the participation of individual franchisees for proof. In response, Plaintiff argues that the individual participation limitation to associational standing does not prevent standing where some individual participation may be necessary. Moreover, Plaintiffs contend that the fact that money damages are not being sought in the SAC should be dispositive with respect to this prong of the Court's inquiry.

"[W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth*, 422 U.S. at 515; *see also Hunt*, 432 U.S. at 343. However, when the "individual participation of each injured party [is] indispensable to proper resolution of the cause" an association will lack standing. *Id*. As Plaintiff points out, the third prong of associational standing is prudential, rather than constitutional. *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996). "[P]rudential limitations are rules of 'judicial self-governance; that 'Congress may remove . . . by statute." *Id*. at 558 (quoting *Warth*, 422 U.S. at 509).

At the outset, the Court notes that, contrary to Plaintiff's assertion, "[a] court's inquiry into the extent of individual participation is required does not end . . . simply because a claim seeks declaratory relief." *Nat'l Franchisee Ass'n v. Burger King Corp.*, 715 F. Supp. 2d 1232, 1239

(S.D. Fla. 2010). Therefore, Plaintiff's suggestion that the Court's inquiry ends simply because Plaintiff seeks only declaratory and injunctive relief is incorrect. Indeed, the Court's determination depends not only on the nature of the relief sought, but also upon the nature of the claims asserted. *See Hunt*, 432 U.S. at 343. Thus, the Court looks to the nature of Plaintiff's claim in Count 2.

To state a FDUTPA claim for injunctive relief, a party must allege a deceptive act or unfair practice, and that the party was aggrieved by the act or practice. *CareerFairs.com v. United Bus. Media LLC*, 838 F. Supp. 2d 1316, 1324 (S.D. Fla. 2011) (citing *Kelly v. Palmer, Reifler, & Assoc., P.A.*, 681 F.Supp.2d 1356, 1366 (S.D. Fla. 2010)). A deceptive practice is one that is "likely to mislead" consumers. *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. 1st DCA 2000). An unfair practice is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Samuels v. King Motor Co. of Fort Lauderdale,* 782 So.2d 489, 499 (Fla. 4th DCA 2001) (quoting *Spiegel, Inc. v. Fed. Trade Comm'n*, 540 F.2d 287, 293 (7th Cir. 1976)). In the SAC, Plaintiff alleges that Defendants engaged in price gouging and a predatory pricing scheme through their mark-ups on Selected Goods, an equity-stripping policy based upon a right of first refusal, and misappropriation and misuse of Advertising Fund monies to the detriment of its franchisee members, and that these practices are deceptive or unfair.

As an example of why individual participation is indispensable in this case, Defendants point to Plaintiff's price-gouging claim based upon allegations that its members are forced to purchase supplies from a sole supplier at a substantial mark-up from the market rate, and that the mark-up eliminates the ability of franchisees to turn a profit. ECF No. [67] at 11. Defendants contend that at least two individualized inquiries would be required with respect to this claim – what the market rate was at the time the supplies were purchased, and characteristics and

circumstances of individual franchisees, such as business management and individual sales practices, with respect to determining the effects on the franchisees' ability to turn a profit. However, Defendants' argument misses the mark. Plaintiff's claim in Count 2 does not seek damages, and as previously noted, to state a claim for injunctive relief under FDUTPA, a plaintiff need only allege that it is a party aggrieved by a deceptive or unfair trade practice. Plaintiff has done so here. Thus, assuming that Count 2 otherwise sufficiently states a FDUTPA claim, Defendants fail to persuade the Court that individualized inquiries from each of Plaintiff's franchisee members would be required. Accordingly, at this juncture, Plaintiff satisfies the third prong for associational standing with respect to Count 2. Therefore, the Court will not dismiss Count 2 for lack of standing.

### B. The SAC fails to state a FDUTPA claim in Count 2 against THUSA or Cil

Defendants also challenge the sufficiency of the FDUTPA claim alleged in Count 2 of the SAC, arguing that the allegations in the SAC are simply different versions of the same allegations underlying Plaintiff's breach of contract claims in previous complaints in this case and two previous lawsuits. Defendants argue further that the practices alleged to be unfair and deceptive are clearly disclosed in the FDD and Franchise Agreements. As such, Plaintiff's FDUTPA claim based on these practices fails because a FDUTPA claim will not lie when the acts complained of comply with the terms of a contract.[3] *See Zlotnick v. Premier Sales Grp.*, 431 F. Supp. 2d 1290, 1295 (S.D. Fla. 2006) (plaintiff failed to state FDUTPA claim where defendant acted in accordance with express terms of contract) *aff'd*, 480 F.3d 1281 (11th Cir. 2007); *see also Amar Shakti*

---

[3] THUSA has provided exemplars of the language in the FDDs and Franchise Agreements that refer specifically to these practices, which the Court may properly consider at this juncture. *See Harris v. Ivax Corp.,* 182 F.3d 799, 802 n.2 (11th Cir.1999) (court may properly consider a document attached to a motion to dismiss in a case in which a plaintiff refers to a document in its complaint, the document is central to its claim and its contents are not in dispute); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1368-69 (11th Cir. 1997).

*Enterps., LLC v. Wyndham Worldwide, Inc.*, No. 6:10-cv-1857-Orl-31KRS, 2011 WL 3687855, at *3 (M.D. Fla. Aug. 22, 2011) (FDUTPA claim did not lie where franchise agreement permitted conduct alleged to be unfair or deceptive). Conduct constituting a breach of contract is actionable under FDUTPA if the conduct underlying the breach is, by itself, unfair or deceptive. *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 n.2 (Fla. 2003). Here, Plaintiff has not plausibly alleged conduct that by itself is unfair or deceptive in conjunction with its claims of a price-gouging scheme, equity-stripping policy, or misuse of the Advertising Fund.

### a. Price-gouging scheme

As a part of Defendants' price-gouging scheme, Plaintiff contends that Defendants marked up prices of Selected Goods to effectively eliminate the ability of franchisees to make a profit, collected undisclosed royalties from franchisees through predatory pricing on Selected Goods, and utilized their buying power solely for the benefit of the franchisor and not the Tim Hortons franchise system as a whole. ECF No. [62] ¶ 93(a)-(c).[4]

However, the Franchise Agreement discloses specifically with respect to the provision of Selected Goods that franchisees may be required to purchase directly from the franchisor, and that the franchisor may make a profit. The Agreement, in pertinent part, states as follows:

> [T]he Franchisee specifically agrees that the Franchisor may require that any and all Items, including ingredients and commodities which may form any part of the Items or the whole product of any food or beverage made, sold or consumed on the Premises or from the Franchised Restaurant . . . be purchased solely from the Franchisor, TH or a third party.
>
> [. . .]

---

[4] Plaintiff also claims that Defendants forced renovations and renewals of equipment at prices that are substantially above market rates, ECF No. [62] ¶ 93(h), but other than the SAC stating that equipment is included within the Selected Goods, *see id*. ¶ 32, there are no factual allegations supporting the forced renovations aspect of Plaintiff's claim.

> It is hereby acknowledged by the Franchisee, that in purchasing such Items, the Franchisor or TH may make a profit or may receive an allowance, commission, rebate, advantage or other benefit on the price of Items sold to the Franchisee.

ECF No. [67-6] at 4 § 5.07(c). In addition, the Agreement provides that franchisees may seek approval to purchase supplies from sources other than those already designated by the franchisor:

> If the Franchisee desires to purchase Items for which the Franchisor has not approved only a single supplier from other than an Approved Supplier, the Franchisee shall submit (or request its proposed supplier to submit) to the Franchisor a written request to approve the proposed supplier . . . .

*Id*. at 5 § 5.07(h). Plaintiff has not alleged that its members attempted to request alternate suppliers. In addition, the mere fact that Defendants obtained a larger profit than Plaintiff's members would like does not in and of itself constitute a deceptive or unfair practice. *See, e.g. Stubblefield v. Follette Higher Educ. Grp., Inc.*, No. 8:10-CV-824-T-24-AEP, 2010 WL 2025996, at * (M.D. Fla. May 20, 2010) (underlying act of making higher profit margin where agreement specified a profit margin did not constitute unfair and deceptive trade practice).

### b.  Equity-stripping policy

As part of the equity-stripping policy, Plaintiff alleges that Defendants enacted a policy to strip equity from franchisees including the valuable goodwill of owning a franchise business. ECF No. [62] ¶ 93(g).

However, the Agreement again specifically provides for the allegedly equity-stripping right of first refusal, stating the following:

> In the event that the Franchisee wishes to transfer the Franchised Restaurant business carried on at the Premises pursuant to this Agreement, the Franchisee shall do so only by first offering to resell the Franchised Restaurant business to the Franchisor at the depreciated value of the furniture, equipment, signs and improvements.

*Id*. at 9 § 11.02. The SAC alleges no more than the fact that Defendants may act in accordance with this provision in the Agreement, which in and of itself does not plausibly constitute an unfair or deceptive practice.[5]

### c. Misuse of the Advertising Fund

Plaintiff alleges that Defendants misused the Advertising fund by failing to provide any benefit to franchisees with regard to marketing, misappropriating Advertising Funds monies for improper uses, and failing to properly account for Advertising Fund monies. ECF No. [62] ¶ 93(d)-(f).

With respect to the Advertising Fund, the Franchise Agreement provides that no benefit is guaranteed to franchisees, as follows:

> The Franchisee acknowledges that . . . the Franchisor accordingly undertakes no obligation to ensure that the Franchisee or any individual Tim Hortons franchisee benefits directly or indirectly in its local market or otherwise from the placement of such advertising and, for greater clarity, the Franchisee acknowledges that this Agreement confers no right to benefit directly or indirectly, in a pro-rata manner or otherwise, from the Franchisee's Advertising Contribution or any general or specific use thereof and/or the Advertising Fund at large.
>
> [. . .]
>
> [T]he Franchisor assumes no direct or indirect liability or obligation to the Franchisee with respect to the maintenance, administration or direction of the Advertising Fund . . . .

---

[5] With respect to Plaintiff's claim regarding equity-stripping, there is the added concern that there are no allegations in the SAC that any of Plaintiff's members in fact attempted to sell their franchises, and thus, any purported injury based upon Defendants' alleged policy would be merely conjectural. Thus, Plaintiff has not sufficiently alleged an injury in fact with respect to its claim based upon equity-stripping.

*Id*. at 7-8 §§ 8.01, 8.02(f). That Plaintiff's members allegedly derived no benefit from the Advertising Fund based on Defendants' alleged misuse of funds alone does not plausibly constitute an unfair or deceptive trade practice.[6]

### d. Plaintiff fails to allege actions independent from breaches of contract

Indeed, Plaintiff does not dispute that the language in the Franchise Agreements deals specifically with the practices it alleges are deceptive and unfair, but instead argues that "no reasonable reading of the disclosures would suggest that THUSA would be *contractually* allowed to engage in the . . . schemes implemented by THUSA to the detriment of the Association's franchisee members." ECF No. [71] at 16 (emphasis added). Plaintiff's reliance upon *Kenneth F. Hackett & Associates, Inc. v. GE Capital Information Technology Solutions, Inc.*, 744 F. Supp. 2d 1305, 1312 (S.D. Fla. 2010) is misplaced because the deceptive and unfair practices alleged there were not specifically encompassed with the parties' agreement. 744 F. Supp. 2d at 1312-13. Here, by contrast, although Plaintiff attempts to recast its claim as independent from the Franchise Agreements, the alleged practices relate directly to Defendants' performance pursuant to the terms of those Franchise Agreements. Thus, taking Plaintiff's allegations as true regarding the price-gouging scheme, equity-stripping policy, and misuse of the Advertising Fund, the SAC states claims that amount to no more than breaches of the Franchise Agreements. *See Sweeney v.*

---

[6] Moreover, Plaintiff's Advertising Fund claim suffers from an additional flaw. Plaintiff alleges that non-party RBI manages the advertising funds for each of its brands, ECF No. [62] ¶ 19. RBI has used various strategies to extract more money from the Tim Hortons franchise system by using the Advertising funds in ways never before used or contractually permitted. *Id*. at ¶ 63. It funnels money to itself, THUSA, and non-party TDL, at the expense of franchisees, ECF No. *Id*. ¶¶ 63-64. Nevertheless, Plaintiff alleges further that THUSA controls the annual contributions to the Advertising Fund, and immediately following RBI's takeover, made several changes to the administration of the Fund that included using monies from the fund for items unrelated to marketing and advertising. *Id*. ¶¶ 67-68. Taken as true, these allegations are inconsistent, and at best, the plausible inference to be drawn from them is that non-party RBI, not Defendants in this case, is the allegedly responsible party. Indeed, the heading in Plaintiff's SAC on this issue is telling: "RBI Misappropriates Advertising Fund Monies." *See* ECF No. [62] at 11.

*Kimberly-Clark Corp.*, No. 8:14-CV-3201-T-17EAJ, 2015 WL 5446797, at *7 (M.D. Fla. Sept. 15, 2015) ("a claim under FDUTPA does not arise merely from an alleged breach of warranty or a breach of contract claim.") (citation omitted). As a result, Count 2 fails to state a plausible claim for violation of FDUTPA. *See Hogan v. Praetorian Ins. Co.*, No. 1:17-cv-21853, 2018 WL 8266803, at *11 (S.D. Fla. Jan. 11, 2018) (dismissing FDUTPA claim where allegations were conclusory and, even if accepted as true, did not create plausible inference of unfair or deceptive acts). Count 2 is due to be dismissed.

Because the Court determines that Count 2 fails to state a plausible claim under FDUTPA based on the alleged practices, the Court does not reach Defendant THUSA's argument regarding the choice-of-law provision or consider Defendant Cil's arguments regarding the sufficiency of the allegations against him individually.

### C.  Leave to Amend

In its responses, Plaintiff requests leave to amend. The Court notes, however, that Plaintiff's request is procedurally improper. The Eleventh Circuit has found that district courts do not abuse their discretion in denying leave to amend where the request appears in an opposition to a motion to dismiss. *See Cita Trust Co. AG v. Fifth Third Bank*, 879 F.3d 1151, 1157 (11th Cir. 2018) (district court "soundly rejected the [plaintiff's] infirm request" for leave to amend because "[w]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly") (quoting *Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009)); *see also Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999) (holding that a plaintiff's failure to request leave to amend anywhere outside of her opposition to the motion to dismiss "preclude[d] the plaintiff's argument on appeal that the district court abused its discretion by denying her leave to amend her complaint").

"A district court need not . . . allow an amendment (1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001).

"[D]enial of leave to amend is justified by futility when the 'complaint as amended is still subject to dismissal.'" *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1320 (11th Cir. 1999); *see Dysart v. BankTrust*, 516 F. App'x 861, 865 (11th Cir. 2013) (same); *St. Charles Foods, Inc. v. Am.'s Favorite Chicken Co.*, 198 F.3d 815, 822-23 (11th Cir. 1999) ("When a district court denies the plaintiff leave to amend a complaint due to futility, the court is making the legal conclusion that the complaint, as amended, would necessarily fail."); *Christman v. Walsh*, 416 F. App'x 841, 844 (11th Cir. 2011) ("A district court may deny leave to amend a complaint if it concludes that the proposed amendment would be futile, meaning that the amended complaint would not survive a motion to dismiss."); *Aguilar v. United Floor Crew, Inc.*, No. 14-cv-61605, 2014 WL 6751663, at *2 (S.D. Fla. Dec. 1, 2014) (same).

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. — the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Foman v. Davis*, 371 U.S. 178, 182 (1962).

In this case, Plaintiff has availed itself of the opportunity to amend once as a matter of right, *see* ECF No. [14], and has already requested the Court's leave to amend a second time in response to motions to dismiss containing similar arguments, *see* ECF Nos. [23], [38], the result

of which amendment was the SAC. Nevertheless, Plaintiff has failed to cure the deficiencies in its previous amended pleadings. Moreover, Plaintiff does not have associational standing to assert Count 1 as its members cannot plausibly allege an injury-in-fact due to non-compliance with the FTC Franchise Rule. As to Count II, Plaintiff cannot allege unfair or deceptive practices distinct from the performance or alleged non-performance of the Franchise Agreements. Therefore, any further amendment would be futile, and the Court need not grant Plaintiff another opportunity to amend.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendants' Motions, **ECF Nos. [67], [68]**, are **GRANTED IN PART AND DENIED IN PART**, as follows:

1. Count 1 of the SAC is **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction.

2. Count 2 of the SAC is **DISMISSED WITH PREJUDICE**.

3. Any pending motions are denied as moot and all deadlines are terminated.

4. The Clerk of Court is directed to **CLOSE** this case.

**DONE AND ORDERED** in Chambers at Miami, Florida, on December 18, 2020.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record